# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN (WATERLOO) DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | ‖ | No. 17-CR-2017-LRR-1 |
| vs. | ‖ | |
| ERIC SALLIS, | ‖ | **REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS** |
| Defendant. | ‖ | |

---

## I.    INTRODUCTION

This case is before me pursuant to defendant's motion to suppress evidence allegedly seized in violation of the Fourth Amendment to the United States Constitution. (Doc. 12). The grand jury charged defendant in a two-count indictment. (Doc. 2). Count 1 charged defendant with possessing ammunition as a felon on November 27, 2016, and Count 2 charged defendant with possessing a firearm as a felon on December 10, 2016. The motion to suppress evidence arises out of an incident on December 9, 2016, when officers arrested defendant on outstanding warrants. Defendant was found in a car outside an apartment building in Waterloo, Iowa. Officers searched an apartment in that building and seized a handgun. In his motion to suppress, defendant argues that the officers unlawfully entered the apartment where he was staying and, as a result, had contact with defendant's niece, which led to searching a tote in which officers found marijuana. Defendant argues that without that unlawfully seized evidence, the search warrant obtained for the apartment lacked probable cause. Defendant argues, therefore, that the Court should suppress evidence of the firearm discovered as a result of the

allegedly unlawful search, and any incriminating statements defendant subsequently made to officers.

The Honorable Linda R. Reade, United States District Court Judge, referred this motion to me for a report and recommendation. On Thursday, June 22, 2017, I held an evidentiary hearing on defendant's motion at which FBI Task Force Officer Ed Savage, Waterloo Police Officer Matthew Woodward, and Sergeant Kye Richter of the Waterloo Police Department testified. The Court admitted into evidence the search warrant (Exhibit 1), and two compact discs containing videotapes from the body cameras of numerous officers who participated in the arrest and search (Exhibits 2 & 3).

For the reasons that follow, I respectfully recommend that the Court deny defendant's motion to suppress.

## II.    FINDINGS OF FACT

On November 27, 2016, a man was admitted to a Waterloo, Iowa, hospital with multiple gunshot wounds. He and other witnesses identified defendant as the shooter. Officers executed a search warrant at defendant's residence where they recovered a 9mm bullet, a 9mm shell casing, and blood spatter, among other evidence, but defendant was not present and officers did not find a firearm. Warrants for defendant's arrest for unrelated offenses were already outstanding. The Waterloo Police Department disseminated information about defendant, the outstanding warrants, and his suspected involvement in the November 27, 2016, shooting to all of its departments, including the Violent Crime Apprehension Team (VCAT). The VCAT unit consists of a group of officers whose primary duty is to investigate and apprehend violent criminals in Waterloo, particularly those involved in gun violence.

Sergeant Richter is the supervisor of the VCAT unit. Sergeant Richter previously served on the Tri-County Drug Task Force for three and half years, and on the VCAT's

predecessor unit (called the Community Response Unit). Sergeant RichterHe attended the Hawkeye Community College studying criminal justice, graduated from the Iowa Law Enforcement Academy, and has received more than 250 hours of additional training in areas including drug trafficking and violent crimes.

On December 9, 2016, a confidential source provided information to Officer Sullivan stating that defendant was staying at an apartment on Pine View with a female named Ecstacy Marshall. The search warrant in this case reflects that Officer Sullivan had known the confidential source for a year, and: the confidential source was a mature individual who was regularly employed; was of truthful reputation; had no motivation to provide false information; had otherwise demonstrated truthfulness; had supplied information in that past on more than four occasions that led to the discovery and seizure of stolen property, drugs, or other contraband; had not given false information in the past; and that officers had corroborated information provided by the confidential source in the instant investigation. (Exhibit 1, at 8.) At the hearing, Officer Woodward and Sergeant Richter testified that the confidential source also told Officer Sullivan that more than one child was present in the apartment, although the officers conceded that there was no mention of the confidential source mentioning children in any of the reports regarding this case.[1] Officers researched Marshall using public databases, including Iowa Department of Transportation records, and learned that Marshall was a relative of defendant and resided at 3860 Pine View Place, Apartment 205. Members of the VCAT team were ordered to conduct surveillance of that residence.

Officers described the residence as part of a multi-unit apartment complex. Videos from the officers' body cameras also depict the residence. 3860 Pine View Place is a

---

[1] Apparently, Sergeant Richter's report mentions knowledge that children were present in the apartment, but the reference appears at a place in the report regarding making entry into the apartment. The parties elicited testimony to this effect from Sergeant Richter, but did not provide me with a copy of the report, so the context and content are not clear.

three-story, twelve-unit building within that complex.  The building is divided in half by an open stairwell, with the apartments opening onto the stairwell.  Apartment 205 is on the second floor of the building, on the far side from the parking lot from where officers arrested defendant.

On the night of December 9, 2016, members of the VCAT unit began surveillance.  At approximately 9:30 PM, officers observed defendant descend the stairs at 3860 (although the officers did not see from which apartment defendant came) and walk out to a Chevrolet Impala parked in the parking lot.  Defendant got into the front passenger seat.  After a moment the driver got out, went to the rear of the car, opened the trunk, retrieved a small, silver bag, and got back into the vehicle.  Officers observed defendant and the driver smoking, though the officers could not determine whether they were smoking cigarettes or marijuana.  Defendant then got out of the car, took off his coat, wrapped it around the silver bag, and returned to the apartment building.  The driver of the Impala then drove off.  Officers did not stop that vehicle.  This entire event lasted less than five minutes.

Officer Woodward, one of the surveillance officers, testified that he has a bachelors' degree in criminal justice, graduated from the Iowa Law Enforcement Academy, received ongoing training regarding drug trafficking and violent crime, has served as a patrol officer, and has been on the VCAT unit for approximately one year.  Officer Woodward testified that based on his training and experience, the short term contact and conduct exhibited by defendant in connection with the Impala was consistent with drug trafficking.  Officer Woodward conveyed his observations to other members of the surveillance team and to Sergeant Richter (who was located out of sight of the apartment building at the time).

At approximately 10:00 PM, officers saw defendant descend the same stairs in the apartment building and come out to another vehicle that had pulled into the parking lot.

Defendant was carrying a silver bag that looked like the same one he had when he left the Impala. This vehicle was occupied by a male driver and a female in the front passenger seat. Defendant got into the right rear passenger seat. Officer Richter decided to arrest defendant based on the outstanding warrants.

Officers descended upon the car and arrested defendant. They searched defendant and found cash and a baggie containing marijuana on his person. On the back seat of the car where defendant had been sitting, officers also found a cellular telephone, the silver bag containing approximately ¼ pound of marijuana, and more than $1,500 in cash. Officer Woodward and Sergeant Richter testified that, based on their training and experience, the quantity of marijuana and cash were consistent with drug trafficking. Defendant would not identify the apartment he had been in, and denied living there, stating he was just "visiting." (Exhibit 3, Sullivan, 22:12).[2] Defendant denied anyone else was present in the apartment but said the female who lived there (whom he did not initially name) was "on the way back." (*Id.*). Defendant made no mention of children being present in the apartment.

Sergeant Richter testified that he decided at that time to apply for a search warrant for the apartment based on all of the evidence obtained that night during the surveillance, together with knowledge that firearms are tools of the drug trade, of defendant's involvement with a shooting on November 27, 2016, and of the fact officers did not recover the firearm during the search of defendant's residence that date or during the current arrest. Twice, once just prior to and once during a search of the backseat of the car, Sergeant Richter can be heard to say "SW" and something to the effect of "we'll need it for the SW." (Exhibits 2, Richter 22:17). Sergeant Richter testified that the

---

[2] Exhibits 2 and 3 each contain multiple clips of video recorded from several officers' body cameras, so references include the not only the exhibit number, but also the name of the pertinent officer's body camera along with the hour and minute counter.

reason for the non-continuous video is during those times he was speaking to his supervisor about obtaining a search warrant for the apartment he made references to the confidential source. Accordingly, those portions of the video were redacted to protect the confidential source's identity.

Sergeant Richter testified at the hearing that "SW" stood for search warrant and the reference reflected his decision at that time to search the apartment. Also, before the officers made entry into apartment, Sergeant Richter is heard to say something about the "kids inside." (Exhibit 2, Richter 22:19). At the hearing, Sergeant Richter testified that at this point in the video he was saying that they needed to check on the kids.[3] Sergeant Richter's body camera video consists of multiple different clips. (Exhibits 2 & 3).

Sergeant Richter obtained Marshall's telephone number from defendant and attempted to call her. A female answered and Sergeant Richter identified himself as a law enforcement officer. He asked the female if she lived in apartment 205. She gave an evasive reply. Sergeant Richter then asked where she lived and the female hung up on him. Sergeant Richter decided to secure the apartment while officers applied for a search warrant. Officers placed defendant in a police car and advised him of his constitutional rights. (Exhibit 2, Sullivan 22:25).

Sergeant Richter and other officers, including Officer Diana Del Valle, but excluding her partner Officer Woodward, went to Apartment 205. Sergeant Richter approached the door and could not hear anything coming from the apartment. He tried the door knob to see if the door was locked so that he could determine how to proceed. When he tried the door knob, the door opened a short distance. Still standing outside, Sergeant Ricer called out to see if anyone was in the apartment. He heard the voice of a

---

[3] I found this reference very hard to make out listening to the video recording and could only make out the words "kids insdie," but Sergeant Richter was not challenged on this point in cross-examination during the hearing.

small child in reply and then saw a small boy, whom Sergeant Richter estimated was four or five years old, come into view from a back hallway. Sergeant Richter asked the boy if anyone else was home. The boy did not immediately respond, so Sergeant Richter pushed the door open a little further so he could have a full view of the living room. The boy then indicated that other children were there and presently other children emerged from the same hallway. At this point, Sergeant Richter and other officers entered the apartment and conducted a protective sweep, confirming that no adults were present. Five children, between the ages of four and ten, were present. Sergeant Richter decided to secure the apartment until officers could find an adult to care for the children and pending the search warrant; he instructed Officer Del Valle to leave with her partner, Officer Woodward, and proceed to the police department to draft a search warrant application.

Officers remained in the apartment and soon Marshall arrived at the apartment with another woman who was the mother of some of the children. Officers informed Marshall that they had defendant in custody and had applied for a search warrant. They asked Marshall whether defendant lived in the apartment. Marshall stated that defendant did not live in the apartment. Marshall indicated that defendant stops by sometimes and that he had stayed overnight the prior night, but that he did not really have anything in her apartment other than some clothes. (Exhibit 3, Wilson, 22:31-33). She pointed out some of defendant's clothes laying on a nearby couch. In response to Marshall's statement that she had nothing to do with drugs and did not want anything like that in her house, officers asked if she would provide consent to search her apartment. She asked to speak to defendant to find out if he had anything illegal in her apartment. Sergeant Richter granted her request.

Officers accompanied Marshall and the other female down stairs and to the parking lot where defendant was brought out of the police car. Officers allowed the females hug

defendant. Marshall asked defendant what he had in her apartment and explained that the officers were going to search her apartment. Although defendant initially denied anything illegal was in the apartment, he then admitted there was marijuana and more cash in the apartment and stated that he did not want officers tearing her apartment apart during a search. He told Marshall to "go get my bag." (Exhibit 3, Sullivan, 22:39). Defendant repeatedly told the officers that "I'll give it to you," referring to the marijuana, and said Marshall would get the bag. (*Id.*).

Officers returned to the apartment with Marshall and ultimately decided to proceed with obtaining the search warrant rather than rely on a consent to search. While waiting for the warrant, Marshall requested to use the restroom. An officer accompanied her to the bathroom, and with Marshalls' consent briefly searched it, found nothing, then left to allow Marshall to use the restroom. When Marshall finished in the bathroom, she returned to the living room carrying a plastic tote holding clothes and a zippered bag. She brought the tote to the officers, indicating that it belonged to defendant. Officers could smell marijuana coming from the tote. (Exhibit 2, Wilson, 22:44). Inside the bag officers apparently saw more packaging in plain view that was similar to the packaging of marijuana in the vehicle.[4]

When Officer Woodward had almost completed the affidavit in support of the search warrant, he received information from officers at the scene about the entry into the apartment, defendant's statements, and the bag in the tote that appeared to contain marijuana. Officer Woodward included this additional information in the affidavit's antepenultimate and penultimate paragraphs. (Exhibit 1, at 8). Officers then took the application to a state court judge and obtained a warrant to search the apartment. During

---

[4] I use the word "apparently" again here because it is not clear from any of the testimony or the videotapes what the officers saw in the bag. The summary of what they apparently observed is reflected only in the search warrant.

the search, officers found a silver bag with marijuana, a clear bag with marijuana, scales, 9mm ammunition, and a Sig Sauer 9mm handgun.

In the meantime, officers had taken defendant to the police station. While there, officers apparently advised defendant about finding the handgun and defendant made incriminating statements about the firearm.[5]

I found all of the officers to be credible witnesses. I further reached certain factual conclusions from the evidence.

First, I find that the confidential source told officers that defendant was staying with children, and I find that information was provided to the officers on December 9, 2016, before officers began surveillance. I reach these conclusions based on my assessment of the officers' credibility while testifying and the fact that they corroborated each other. I also based my conclusions on the contemporaneous statement Sergeant Richter made referencing the "kids inside" before officers entered the apartment. Although I am aware that the officers did not specifically reference in their reports the fact that they obtained this information from the informant, I do not find this significant because: (1) officers do not and cannot reasonably be expected to write down in their reports everything they learn, especially when the importance of some facts, like this, can only be appreciated with the benefit of hindsight; and (2) in this case there is no other source for the information that children were present that would explain Sergeant

---

[5] Again, I use the word "apparently" because the parties did not offer any evidence of this. Rather, during argument the defendant discussed the scope of evidence subject to suppression and proffered the information about the admissions. Although the government bears the burden of proving that illegally obtained evidence is not fruit of the poisonous tree, the defendant bears the initial burden of establishing a nexus between the illegality and the challenged evidence. *See Alderman v. United States*, 394 U.S. 165, 183 (1969) (holding that defendant must come forward with specific evidence demonstrating that evidence is tainted to be entitled to suppression under fruit of the poisonous tree doctrine). The government conceded the nexus during argument, however, and agreed that if the Court suppresses evidence of the firearm, then defendant's statements would be fruit of the seizure of the firearm.

Richter's contemporaneous reference to children as neither defendant nor Marshall said anything about children before Sergeant Richter made the statement.

Second, I find that officers began the process of applying for a search warrant prior to making entry into the apartment. I based that conclusion again on my assessment of the officers' credibility having observed their demeanor, and the fact that the officers corroborated each other's testimony. I also based that conclusion again on a contemporaneous comment made by Sergeant Richter captured on the video when he referenced a "SW" while searching the back of the car in the parking lot. It is further corroborated by the need for redaction of Sergeant Richter's body camera video when he spoke with his supervisor about searching the apartment.

Third, I find that defendant stayed overnight in Marshall's apartment the night before the search. Although Marshall was imprecise and somewhat inconsistent in answering the officers' questions about the extent to which defendant stayed in the apartment, she unequivocally stated that defendant had spent the prior night in the apartment. Moreover, defendant had clothing and other belongings in the apartment, consistent with him staying there overnight.

Fourth, I find that there was nothing of evidentiary value obtained by the officers by entering the apartment before Marshall brought them defendant's tote containing the marijuana. The parties conceded this issue during argument.

### III.    ANALYSIS

Defendant's motion raises a number of issues. The first issue is whether defendant had a reasonable expectation of privacy in the apartment such that he has standing to challenge the constitutionality of the officers' entry into and search of the apartment. The second issue is whether officers violated the Fourth Amendment when they entered the apartment prior to obtaining a search warrant. The third issue is whether defendant

consented to the seizure of the tote containing the marijuana. The final issue is whether the officers would have inevitably discovered the evidence through the search warrant. I will address each of these issue in turn.

### A.    *Defendant's Reasonable Expectation of Privacy*

The government argues that defendant does not have standing to challenge the constitutionality of the search because defendant did not have a reasonable expectation of privacy in the apartment. (Doc. 17, at 6-8). The government argues that defendant was nothing more than a casual visitor. (Doc. 17, at 8). The government alleges that defendant did not possess a key and there was no evidence that he had the authority to exclude anyone from the residence. (*Id*.). It states that the tote containing his belongings was located in a hallway and that there was no indication that defendant took precautions to maintain his privacy of the tote.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . .." U.S. Const. amend. IV. Fourth Amendment rights are personal rights that may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978). In other words, "[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134. "[T]he person challenging the search has the burden of showing both a subjective expectation of privacy and that the expectation is objectively reasonable; that is, one that society is willing to accept." *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999). Among the factors relevant to these issues are: "whether the party has a possessory interest in the things seized or the place searched; whether the party can exclude others from that place; whether the party took precautions to maintain the

privacy; and whether the party had a key to the premises." *Id*. (citations omitted). *See also United States v. Nabors*, 761 F.2d 465, 469 (8th Cir. 1985) (identifying factors). Courts have repeatedly criticized the use of terms such as "guest," "invitee," "lessee," "licensee" or other property law terms to determine Fourth Amendment rights, although a defendant's possessory interest in the area searched remains a factor to consider when evaluating a defendant's reasonable expectation of privacy. *See Jones v. United States*, 362 U.S. 257, 265–66 (1960). A "casual visitor" does not have a reasonable expectation of privacy in a residence. *United States v. Payner*, 447 U.S. 727, 731 (1980) (holding that a visitor who arrived only a minute before a search does not have a reasonable expectation of privacy in the residence). *See also Minnesota v. Carter*, 525 U.S. 83, 91 (1998) (holding that a guest that is merely present with the consent of the householder may not claim the protection of the Fourth Amendment). On the other hand, an overnight guest has a reasonable expectation of privacy in the residence. *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990) (recognizing the reasonable expectation of privacy in a dwelling for an overnight guest).

In this case, there was no evidence presented at the hearing regarding whether defendant had or did not have a key to the apartment. There was no evidence presented regarding whether defendant had or exercised authority to exclude others from the apartment. Moreover, the evidence did not clearly show the location from which Marshall recovered the tote and whether it had been stored in a manner consistent with defendant attempting to maintain his privacy. The evidence at the hearing showed defendant had some clothing on a couch in the living room and a tote containing more belongings kept somewhere in the apartment. Marshall told the officers that defendant visited the apartment from time to time, although both defendant and Marshall denied that defendant lived there. The most important fact in this analysis, however, is Marshall's statement that defendant had stayed overnight in her apartment. The Supreme

Court has made it clear that an overnight guest has a reasonable expectation of privacy in the premises.

Therefore, I find defendant has standing to challenge the constitutionality of the officers' search of the apartment.

### B.    The Officers' Entry into the Apartment

It is well-established that a search within a home without a warrant is presumptively unreasonable. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). *See also United States v. Valencia*, 499 F.3d 813, 815 (8th Cir. 2007) (stating that when the government enters a defendant's residence without a warrant, the court "presume[s] that the search was unreasonable and therefore in violation of the Fourth Amendment.") (citation omitted). The government has the burden of overcoming the presumption of unreasonableness that attaches to all warrantless home entries. *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984). Here, the government cites two reasons it claims justified the officers' warrantless entry: (1) the community caretaker function; and (2) to secure the premises pending the warrant. (Doc. 17, at 8-10).

#### 1.    Community Caretaker Function

The government first asserts that the officers could make a warrantless entry into the apartment to check on the welfare of unattended children. (Doc. 17, at 8-9). The government can rebut the presumption of unconstitutional entry by establishing exigent circumstances which "make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978). "An exception to the warrant requirement permits an officer to enter a home if he or she acts with probable cause in the presence of exigent circumstances." *United States v. Schmidt*, 403 F.3d 1009, 1013 (8th Cir. 2005). This is an objective inquiry, which asks "what an objectively reasonable officer

on the scene could have believed." *Id.* "[L]egitimate concern for the safety of individuals may constitute 'exigent circumstances' justifying warrantless entr[y]" into a residence. *United States v. Antwine*, 873 F.2d 1144, 1147 (8th Cir. 1989) (citations omitted). The Eighth Circuit Court of Appeals has repeatedly held that a "legitimate concern for the safety of individuals" may constitute exigent circumstances, justifying a warrantless entry. *United States v. Uscanga–Ramirez*, 475 F.3d 1024, 1028 (8th Cir. 2007); *United States v. Janis*, 387 F.3d 682, 687 (8th Cir. 2004); *Antwine*, 873 F.2d at 1147.

In *Cady v. Dombrowski*, 413 U.S. 433 (1973), the Supreme Court recognized that law enforcement officers are frequently involved in activities which are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441. The Court described these activities as "community caretaking functions." *Id.* As the Eighth Circuit Court of Appeals has explained:

> [T]here is a difference between standards that apply when an officer makes a warrantless entry when acting as a so-called community caretaker and when an officer makes a warrantless entry under the probable cause standard to investigate a crime. Police officers, unlike other public employees, tend to be 'jacks of all trades' who often act in ways totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of criminal law.

*United States v. Quezada*, 448 F.3d 1005, 1007 (8th Cir. 2006). Officers' community caretaking activities, undertaken to help people in danger or to protect property, are unrelated to their duties to investigate and uncover criminal activity, even if the event giving rise to that function arises out of a criminal investigation. *Id.* Officers may enter a residence without a warrant pursuant to community caretaker duties if there is a reasonable belief that an emergency exists which requires attention. *Id.* (citing *Mincey*, 437 U.S. at 392–93). This reasonable belief standard under the community care function

"is a less exacting standard than [the] probable cause [standard]." *United States v. Smith*, 820 F.3d 356, 360 (8th Cir. 2016) (internal quotations omitted).

In this case, I find the officers had a reasonable belief that unsupervised children were inside the apartment. The officers knew before the surveillance began that defendant was staying in the apartment with children. After officers arrested defendant, he stated that the woman who lived in the apartment was on her way, suggesting the children were not currently supervised. A phone call to Marshall was not productive. Officers had reason to believe defendant was in possession of a firearm, and it was reasonable for them to believe when they did not find the firearm on defendant or in the car after his arrest, that it may be in the apartment where unattended children were present. This court has previously found exigent circumstances justified a warrantless entry under such circumstances. *See United States v. Tamborello*, No. CR 10–0028, 2010 WL 2802603, at *6 (N.D. Iowa Jul. 15, 2010) (warrantless entry justified under community caretaking doctrine; officers believed two unsupervised children were in home where guns were present but nobody answered their repeated knocks on the door). Under the totality of the circumstances in this case, I find the officers had reasonable cause to enter the apartment without a warrant for the welfare of the children.

At the hearing, defendant suggested the community caretaking explanation was a pretext for an entry made for investigatory purposes. Fourth Amendment analysis is based upon an objective, not subjective, basis. *See United States v. Kuenstler*, 325 F.3d 1015, 1021 (8th Cir. 2003) ("The analysis of whether this exception to the warrant requirement has been made out is an objective one focusing on what a reasonable, experienced police officer would believe.") (internal quotation marks and citation omitted). Accordingly, the subjective intent of the officers is irrelevant. In any event, I see no evidence of pretext here. I already noted officer Richter's contemporaneous reference to checking on the children, a statement he made before entry into the

apartment. Further, in viewing the video from the officers' body cameras, I noted that the officers did not take protective positions or draw their weapons when approaching the apartment or opening its door. This strikes me as consistent substantiation that the officers believed only children were present in the apartment.

2. <u>Securing Premises Pending Obtaining Search Warrant</u>

The government alternatively argues that the officers were justified in entering the apartment to secure the premises pending obtaining the search warrant because they "reasonably believed that evidence was in danger of being destroyed." (Doc. 17, at 9). The exigent circumstances exception includes situations in which evidence is about to be destroyed. *United States v. Pierson*, 219 F.3d 803, 805 (8th Cir. 2000); *United States v. Roby*, 122 F.3d 1120, 1125 (8th Cir. 1997); *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996). This exception to the warrant requirement, however, is narrowly drawn. *United States v. Francis*, 327 F.3d 729, 735 (8th Cir. 2003); *Ball*, 90 F.3d at 26.

Looking at the totality of the circumstances present here from the objective viewpoint of a reasonable officer, I find the officers were not justified in entering the apartment without a warrant on the belief that evidence might be destroyed. Here, as noted above, the circumstances suggested that only children were present in the apartment. Although Marshall's unwillingness to speak to the officers might give rise to a concern she was in the apartment and could destroy evidence, the officers had reason to believe from defendant's comments that she was not present at the time. Moreover, officers had no reason to believe Marshall was involved in any illegal activity. Nor were there other circumstances present that would have led officers to believe that someone involved in the criminal activity was inside the apartment and was aware of defendant's arrest. This is especially so because the apartment was located on the opposite side and out of view of the parking lot where officers arrested defendant. *See United States v.*

*Marin–Cifuentes*, 866 F.2d 988, 991–92 (8th Cir. 1989) (finding that exigent circumstances supported warrantless search given police surveillance of meetings between dealers prior to drug delivery, phone calls to hotel room occupant from known drug dealers, and the arrest of the dealers which would likely tip off the hotel occupant who was known to be "surveillance conscious"). Finally, the officers did not hear anything from outside of the apartment that would have led them to believe that if they did not enter the apartment evidence would immediately be destroyed before they could obtain a warrant. *See United States v. Ramirez*, 676 F.3d 755, 763 (8th Cir. 2012) (finding entry unjustified under the exigent circumstances exception to the warrant requirement because "at the time these officers sought to gain entry by swiping the key card, they had no indication whatsoever that there was any activity at all in the hotel room, let alone any activity that might lead them to believe that the occupants inside might imminently destroy evidence.").

Therefore, I find the officers' warrantless entry into the apartment was justified under the community caretaker exception, but not under the exigent circumstances exception based on a fear that evidence would be destroyed.

### C.    *Whether Defendant Consented to the Search*

The government argues that defendant consented to the search and seizure of the tote containing the marijuana. (Doc. 17, at 10-11). When Marshall spoke with defendant outside the police car and asked him what was in the apartment, defendant admitted there was more marijuana in the apartment, told the officers he would have Marshall get it for them, and repeatedly told the officers that he would give it to them because he did not want the officers to tear apart Marshall's apartment during a search. The government argues that these statement reflect defendant's consent to enter the apartment and seize the marijuana.

Where a person having authority over the premises voluntarily consents to a search, officers may conduct a warrantless search. "Voluntary consent may be express or implied." *United States v. Lakoskey*, 462 F.3d 965, 973 (8th Cir. 2006). Verbal consent need not be explicit. *See United States v. Grant*, 375 Fed. App'x 79, 80 (2d Cir. 2010) ("Thus a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'") (quotation omitted). In addition, in order to show actual or implied consent the government must also prove by a preponderance of the evidence that the defendant's consent was voluntary based on the totality of the circumstances. *United States v. Williams*, 521 F.3d 902, 906–07 (8th Cir. 2008). In determining whether consent is freely and voluntarily given, the focus is "whether, in light of the totality of the circumstances, consent was given without coercion, express or implied." *United States v. Sanders*, 424 F.3d 768, 773 (8th Cir. 2005). "The question of whether a person expressed consent to a search is a question of fact, as is the question of whether such consent was voluntary." *United States v. Spotted Elk*, 548 F.3d 641, 650 (8th Cir. 2008).

Here, I find that defendant consented to the officers seizing the marijuana. Defendant made it clear in his statements that he was consenting to the officers seizing the marijuana and instructed Marshall to give it to the officers. Although he did not explicitly state that he consented to a search and seizure of his marijuana, consent was implied when he repeatedly said "I'll give it to you." Perhaps defendant hoped that in doing so officers would not continue to search the apartment and find the firearm. Whatever his underlying motivation, however, he expressed a willingness for the officers to seize the marijuana. I also find, under the totality of the circumstances, that his consent was voluntary. Although defendant was in custody at the time he gave consent, officers had previously advised him of his constitutional rights. Further, defendant's statements

constituting consent were not the result of officers questioning him or asking for consent, but, rather, in response to statements made by Marshall.

At the hearing, defendant argued that any consent would be invalid because it was the product of the officers' illegal entry in the first instance. Essentially, defendant's position is that, but for the illegal entry officers would not have had a conversation with Marshall, who then would not have had the conversation with defendant about getting the marijuana for the officers, which then would not have resulted in Marshall showing the officers the tote with the marijuana, and without that conversation and officers seeing the marijuana, there was no probable cause to support the warrant. The problem with this chain of causation argument is that it is too attenuated. The "attenuated connection" exception applies when the chain between the challenged evidence and the primary taint of illegality is so long or only linked by sophisticated argument such that exclusion is not warranted. *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963) (rejecting "but for" test for determining whether evidence is fruit of the poisonous tree and noting that in some cases connection between illegal conduct and discovery of challenged evidence will "become so attenuated as to dissipate the taint"). In this case, the officers gained nothing of evidentiary value until Marshall arrived. She would have arrived at the apartment and spoken to the officers even if the officers had remained outside her apartment. It seems reasonable to assume officers would have had the same conversation with Marshall had they not entered the apartment, which would have led to the same conversation with defendant about the marijuana in the apartment. Thus, it does not follow that the officers' entry into the apartment led to Marshall's conversation with defendant wherein he consented to the officers' entry into the apartment and seizure of the marijuana.

Accordingly, I find that defendant voluntarily consented to the officers' seizure of the marijuana and therefore the inclusion of information regarding defendant's statements

about and seizure of the marijuana in the application for the search warrant was not improper.

### D.     Inevitable Discovery

The government argues alternatively that even if the entry into the apartment violated defendant's Fourth Amendment rights and he did not voluntarily consent to seizure of the marijuana, that the Court should not suppress the evidence because it would have been inevitably discovered as a result of the search warrant. (Doc. 17, at 11-12). To be clear, defendant has not challenged the sufficiency of the search warrant as submitted; rather, defendant argues that the information added to the affidavit from the scene was necessary to established probable cause and without it the search warrant lacked probable cause. Defendant also argues that the government was no independently pursuing a search warrant until after illegally seizing the marijuana from the apartment. The government disagrees.

There are two distinct but related exceptions to the exclusionary rule that apply here. The first is the so-called "independent source" exception where the evidence is admissible if the government can show it derived the evidence from a lawful source independent of the unconstitutional conduct. *See Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 385 (1920). The second is the so-called "inevitable discovery" exception where the evidence is admissible if the government can establish that it would have inevitably discovered the challenged evidence without reference to the illegal conduct giving rise to the primary taint. *See Nix v. Williams*, 467 U.S. 431, 444 (1984). Under the independent source exception, the government must demonstrate that it discovered the evidence without reliance on tainted information. Under the inevitable discovery exception, the government must show that it would have inevitably discovered the evidence, even though it relied on tainted information.

*Segura v. United States*, 468 U.S. 796 (1984), involved application of the independent source doctrine. There, law enforcement officers secured an apartment from the inside for the purposes of preventing the destruction of evidence while waiting to acquire a search warrant for the premises. The Supreme Court determined that "[w]hether the initial entry was illegal or not is irrelevant to the admissibility of the [evidence seized pursuant to the warrant]. . .." *Id*. at 813–14. In *Segura*, the warrant application did not include any of the information derived from the entry. *Id*. at 814. The Court held that the evidence seized under the valid warrant "was the product of [the warrant] search, wholly unrelated to the prior entry. The valid warrant search was a 'means sufficiently distinguishable' to purge the evidence of any 'taint' arising from the entry." *Id*. (quoting *Wong Sun*, 371 U.S. at 488).

"Evidence is purged of taint and should not be suppressed '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. McManaman*, 673 F.3d 841, 846 (8th Cir. 2012) (quoting *Williams*, 467 U.S. at 444). The inevitable discovery exception applies when the government proves "by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997). *But see United States v. Thomas*, 524 F.3d 855, 860–63 (8th Cir. 2008) (Colloton, J., concurring) (arguing that this two-pronged test is both over- and underinclusive, and that it is not consistent with *Nix v. Williams*). In determining whether the government would have inevitably discovered the evidence without the tainted information, "it is important to focus not on what the officers actually did after unlawfully recovering evidence, but

on what the officers were reasonably likely to have done had the unlawful recovery not occurred." *United States v. Villalba–Alvarado*, 345 F.3d 1007, 1020 (8th Cir. 2003).

Because the search warrant application included the information about the marijuana that officers obtained after entering the apartment without a warrant, the inevitable discovery exception, and not the independent source exception, applies. Here, I find officers would have inevitably discovered the evidence even without the tainted information. Even if the information from the scene were redacted from the search warrant application, I find there was more than enough probable cause for a judge to issue the search warrant in this case. The affidavit established that defendant was involved in a shooting in November 2016, and the firearm had not been recovered. (Exhibit 1, at 5-6). The affidavit further established that on December 9, 2016, defendant engaged in conduct (the short term traffic to and from the Impala) indicative of drug trafficking, followed by defendant's entry into another car from which officers seized a distribution-quantity of marijuana and a large amount of cash. (Exhibit 1, at 6-7). That information, combined with the information linking defendant to the apartment, supported probable cause to search the apartment, independent of the evidence obtained as a result of the officers' warrantless entry into the apartment.

I further find officers were actively pursuing a search warrant before and independent of the information gained as a result of the warrantless entry. As explained in the fact section above, I credit officers' testimony that they were pursuing a search warrant before any entry was made into the apartment. I also credit Officer Woodward's testimony that he was almost done drafting the search warrant application when he received a call from the scene relating the additional information contained in the antepenultimate and penultimate paragraphs of the affidavit.

Therefore, I find that even if officers' entry into the apartment violated defendant's Fourth Amendment rights, that the Court should not suppress the evidence because of the inevitable discovery exception.

## IV.   CONCLUSION

In summary, I find officers had a reasonable articulable basis to believe that defendant was engaged in criminal activity (carrying a concealed weapon) and had a reasonable basis to believe defendant was armed, which was sufficient to justify a pat-down search. For the reasons set forth above, I respectfully recommend the Court **deny** defendant's motion to suppress (Doc. 11).

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and FED. R. CRIM. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* FED. R. CRIM. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED t**his 28st day of June, 2017.

C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa